131 T.C. No. 2

UNITED STATES TAX COURT

BRADLEY J. BERGQUIST AND ANGELA KENDRICK, ET AL.,[1] Petitioners
<u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  17530-06, 17535-06,    Filed July 22, 2008.
             17537-06, 17541-06,
             17545-06, 17549-06.

       As part of a consolidation of various separate
medical professional service corporations into a
single consolidated medical practice group controlled
and managed by the Oregon Health & Science
University, medical doctors donated their stock in
their medical professional service corporation to a
charity and for Federal income tax purposes claimed
charitable donations relating thereto of $401.79 per
share.

———————————————

[1]     Cases of the following petitioners are consolidated
herewith:  Robert E. and Patricia F. Shangraw, docket No.
17535-06; Stephen T. and Leslie Robinson, docket No. 17537-06;
William W. Manlove, III, and Lynn A. Fenton, docket No. 17541-
06; John L. and Catherine J. Gunn, docket No. 17545-06; and
Harry G.G. and Sonia L. Kingston, docket No. 17549-06.

Held: On the date of donation the donated stock had a fair market value of approximately $37 per share.

Held, further, on the facts of this case and in spite of advice from attorneys, accountants, and other advisers, the doctors are liable for the applicable 40- or 20-percent accuracy-related penalties.

Philip N. Jones and Peter J. Duffy, for petitioners.

Shirley M. Francis, for respondent.

SWIFT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and accuracy-related penalties as follows:

| Petitioner | Year | Deficiency | Penalty Sec. 6662 |
|------------|------|------------|-------------------|
| Kendrick | 2001 | $26,668 | $10,667 |
| | 2002 | 25,208 | 10,083 |
| | 2003 | 6,662 | 2,640 |
| Shangraw | 2001 | 31,464 | 12,586 |
| | 2002 | 23,400 | 9,360 |
| Robinson | 2001 | 25,703 | 10,281 |
| | 2002 | 27,535 | 11,014 |
| | 2003 | 6,289 | 2,516 |
| Fenton | 2001 | 19,603 | 7,841 |
| | 2002 | 21,061 | 8,424 |
| | 2003 | 14,174 | 5,670 |
| Kingston | 2001 | 61,024 | 24,410 |
| | 2002 | 5,910 | 2,364 |
| Gunn | 2001 | 19,043 | 7,617 |
| | 2002 | 4,710 | 942 |
| | 2003 | 9,269 | 3,708 |

The primary issue for decision in these consolidated cases is the fair market value of stock in a medical professional service corporation that was donated to a charitable professional service corporation.

These cases were consolidated for purposes of trial, briefing, and opinion. On the stock valuation issue, the parties in 20 related but nonconsolidated cases also pending before the Court have stipulated to be bound by the final decisions rendered herein. The parties in the 20 related nonconsolidated cases have stipulated to be bound by the final decisions herein on the penalties only if our holding on the penalties is the same for all consolidated petitioners.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petitions were filed, petitioners resided in Oregon.

Petitioners Angela Kendrick, Robert Shangraw, Stephen Robinson, Lynn Fenton, and Harry Kingston are medical doctors, each with a specialty in anesthesiology and each licensed to practice medicine in Oregon. Petitioner John Gunn (Gunn) is a

certified public accountant.  Hereinafter, all references to petitioners and/or to any of the above surnames are to the specific petitioners named in this paragraph, not to their respective spouses with whom they filed joint Federal income tax returns for the years in issue.  Also, generally references to petitioners are to the petitioners who are medical doctors, not to Gunn.

From 1994 to 2001 petitioners practiced medicine as employees of and as stockholders in University Anesthesiologists, P.C. (UA), a medical professional service corporation specializing in anesthesiology.[2]  From 1994 to 2001 Gunn was the chief executive officer of and a stockholder in UA.

Through UA, petitioners provided medical services to patients of the Oregon Health & Science University Hospital (OHSU), a public teaching and research hospital in Portland, Oregon.  UA was the exclusive provider of anesthesiology medical services to all OHSU hospitals and clinics. Petitioners also took on significant teaching duties as members of OHSU's teaching faculty in the OHSU medical school's Department of Anesthesiology.

Petitioners were employed by UA on month-to-month contracts.  UA employment contracts with petitioners did not

---

[2] Fenton did not affiliate with UA until 1997.

include noncompete or nonsolicitation clauses and provided for immediate termination if an anesthesiologist was terminated from his or her OHSU medical school faculty position.

Before the donation of the stock that is in issue in these cases, petitioners and Gunn each held 100 shares of UA's voting common stock which they purchased in 1994 at $1 per share.

In addition to UA, approximately 30 other medical practice specialty groups (e.g., OBGYNs, cardiologists, radiologists, and orthopedic surgeons) were affiliated with OHSU through separate medical professional service corporations in a manner similar to that of UA in which the medical doctors provided specialty medical services to OHSU hospitals and clinics and also took on teaching duties as members of the OHSU medical school teaching faculty.

Consistent with the typical management of medical professional service corporations, at the end of each year UA generally paid bonuses, salaries, and prepaid expenses that offset reported income.  UA never declared or paid cash dividends to its stockholders.  UA's only significant booked asset was its accounts receivable.

In the late 1990s and after careful consideration and discussion, because of perceived risks and management concerns associated with the many separate medical practice specialty groups that were providing (through their respective

professional service corporations) medical services to OHSU hospitals and clinics, OHSU's executive management concluded that the consolidation into a single medical practice group, controlled and managed by a single professional service corporation which in turn would be under OHSU's direct management and administration, would be required of all the different medical practice specialty groups that wished to continue to be affiliated with OHSU (hereinafter sometimes referred to simply as the consolidation).

Under the consolidation, medical doctors practicing at OHSU hospitals and clinics, including petitioners, were to leave their separate medical practice specialty groups and their medical professional service corporations and were to become employees of a newly formed single consolidated medical practice group operating and providing medical services through a newly formed tax-exempt professional services corporation. In the late 1990s the OHSU Business Operations Steering Committee, of which Gunn was a member, was formed to assist in the planning and implementation of the consolidation.

In 1998 OHSU management formed the OHSU Medical Group (OHSUMG) as a section 501(c)(3) tax-exempt professional service corporation to serve as the single consolidated medical group into which all of the then-extant 30 different medical practice

specialty groups whose doctors were affiliated with OHSU would be consolidated.

An initial target date for consolidation into OHSUMG of the medical practice specialty groups was set for January 1, 2001, but for reasons not clear in the record the target date was rescheduled for July 1, 2001.

Initially it was intended that OHSUMG would offer to all of the medical doctors to be employed by OHSUMG a governmental pension plan, exempt from ERISA requirements, with flexibility and various contribution and retirement options for the medical doctors. In an effort to provide such a plan, OHSUMG management requested a private letter ruling from respondent under which OHSUMG would be treated as a governmental instrumentality and the OHSUMG proposed pension plan would be treated as an ERISA-exempt governmental plan within the meaning of section 414(d).

OHSUMG management and attorneys were optimistic that respondent would issue a favorable private letter ruling with regard to the pension plan. As a contingency, however, in case OHSUMG did not receive from respondent a favorable tax ruling, OHSUMG management began developing an ERISA-compliant, nongovernmental pension plan. Robinson, as a member of OHSUMG's pension committee, presented to the committee several viable ERISA-compliant plans and took part in strategizing how

to "sell" an ERISA-compliant plan to the doctors.  Although some doctors preferred a governmental plan, in general petitioners and the other UA anesthesiologists appeared not to have a preference and were concerned only that OHSUMG have some form of a pension plan in place by the date of the consolidation.

In early 1999 Gunn attended a conference sponsored by the Medical Group Management Association.  During a roundtable discussion at the conference, Gunn learned that for Federal income tax purposes some doctors throughout the country apparently were claiming substantial charitable contribution deductions relating to donations to academic-affiliated institutions of stock in their medical professional service corporations.

Upon returning from the conference and in view of the planned consolidation, Gunn discussed with UA's attorney, UA's accountant, and OHSUMG's C.E.O. the possible tax benefits and other ramifications if, as a step associated with the consolidation, petitioners and the other UA anesthesiologists were to donate their UA stock to OHSUMG and to claim charitable contribution deductions with regard thereto.

On June 7, 1999, UA held a stockholders meeting at which the potential tax benefits of donating UA stock to OHSUMG were

described as offering a "huge [tax] windfall" of "150K" to each UA stockholder.

On February 27, 2001, the chairman of the OHSU Department of Anesthesiology and the president of UA sent an e-mail message to the UA stockholders which stated:

> As the time to convert to OHSUMG comes closer, we need to meet and thoroughly discuss implications of our donation of * * * [UA stock] to OHSUMG. As you are aware, we believe that there are some significant tax advantages to doing this.
>
> I would like to call a shareholders' meeting for Tuesday, March 6 at 4:30 pm. The object will be to talk about the transition and the legal and tax implications of this. At a later stage, should this be necessary, I would be pleased to invite * * * [UA's attorney] and * * * [UA's accountant] to be present to answer any questions you may have. [Emphasis deleted.]

In or around April 2001 an attorney for UA informed each UA stockholder of the steps to be taken to make the donation to OHSUMG of his or her UA stock and to claim a charitable contribution deduction with regard thereto.

Under the plan outlined by the UA attorney, a new class of nonvoting UA stock would be issued through the distribution of a UA stock dividend. The attorney believed that this step was necessary to comply with Oregon law under which a majority of voting stock in a medical professional service corporation was required to be held by licensed Oregon doctors. See Or. Rev. Stat. sec. 58.375(1)(a) (2001).

The attorney's plan then called for UA stockholders to donate their UA stock to OHSUMG in two stages. Before the consolidation they would donate to OHSUMG their newly created UA nonvoting stock and claim substantial charitable contribution deductions relating thereto. After the consolidation they would donate to OHSUMG their UA voting stock and possibly claim additional charitable contribution deductions relating thereto.

The UA attorney believed his plan would maximize the amounts of charitable contribution deductions UA stockholders could claim by allowing UA stockholders to donate most of their UA stock while at the same time retaining control of UA to avoid violating Oregon law.

Once the consolidation was completed, UA would have no doctors and no patients, and UA would not operate and would continue in existence for a period of time simply to collect accounts receivable outstanding as of the date of the consolidation. It was expected that after the consolidation UA's winding-down expenses would reduce UA's taxable income to zero.

On May 9, 2001, an OHSUMG attorney was contacted by respondent's representative and was informed that respondent would not treat OHSUMG as a governmental instrumentality and that the proposed OHSUMG pension plan would not be exempt from

ERISA.  To have more time to attempt to reverse respondent's position, OHSUMG management postponed the planned consolidation until January 1, 2002.

On May 23, 2001, pursuant to the UA attorney's plan of donation, UA declared a stock dividend and issued to each of the 28 UA stockholders 4 shares of nonvoting stock for each share of UA voting stock held, so that after the stock dividend each UA stockholder held 100 shares of voting stock and 400 shares of nonvoting stock.

On June 6, 2001, UA retained Houlihan Valuation Advisors (Houlihan) to value the UA stock to be donated.  In a letter to Houlihan, the UA attorney described the planned consolidation and wrote that OHSUMG would "be the employer of all of the physicians, including the [UA] anesthesiologists, after the reorganization is completed."

In June 2001 Gunn retired as UA's C.E.O. and was hired by UA as a business consultant.  Gunn was not replaced as UA's C.E.O., but on July 1, 2001, UA hired Lynda Johnson as chief administrative officer (C.A.O.) largely to plan for the consolidation.

On approximately September 8, 2001, upon OHSUMG's request, UA staff began preparing pro forma cashflow projections. OHSUMG requested that the cashflow projections be prepared under the assumption that at the end of 2001 all UA

anesthesiologists would move to OHSUMG and that UA would no longer operate.

On September 10, 2001, the UA accountant, the UA attorney, and Robinson met to discuss the planned consolidation and the planned donation of UA stock to OHSUMG. The final decision made at the meeting was that the planned donation by the UA stockholder of their UA stock would go forward on September 14, 2001.

On September 14, 2001, 24 of the 28 UA stockholders each donated to OHSUMG 40 shares of their UA voting stock and all 400 shares of their UA nonvoting stock. On that same day each of the remaining four UA stockholders, including Gunn, donated to OHSUMG all 100 shares of their UA voting stock and all 400 shares of their UA nonvoting stock. At the time of the above donation, each of the UA stockholders had a basis of 20 cents per share in his or her UA stock.

OHSUMG's executive management accepted the donation of UA stock as a professional courtesy to the UA stockholders. At the time of donation, OHSUMG's management did not expect to derive any economic benefit from the donated UA stock. OHSUMG management did not expect to receive and in fact did not receive from UA any dividends or distributions.

On October 5, 2001, Houlihan appraised the donated UA voting and nonvoting stock as of August 31, 2001, at $401.79

per share, or a total donation of $200,895 for Gunn and a total donation of $176,787 for each of the other petitioners.

On October 23, 2001 because respondent had not yet issued the requested private letter ruling, the OHSUMG board agreed to implement an ERISA-compliant plan under section 403(b) to become effective on January 1, 2002.

In October 2001, the medical practice groups for the OHSUMG Departments of Ophthalmology, Orthopedics, Integrated Primary Care Organization, and Pediatric Surgery consolidated into OHSUMG, and the doctors from those practice groups became employees of OHSUMG.[3]

On November 11, 2001, Kingston, Robinson, and Gunn met with UA's attorney and accountant to discuss whether the UA anesthesiologists should donate to OHSUMG their remaining UA stock. At the meeting it was decided that the planned second donation of UA stock would not be beneficial because there likely would not be enough value in the UA shares to justify the expenses involved with claiming a charitable contribution deduction--namely, a second appraisal fee. Accordingly, the planned second donation of the remaining UA voting stock never occurred.

---

[3] The record does not indicate why certain medical groups joined OHSUMG before the scheduled consolidation date of Jan. 1, 2002.

On January 1, 2002, the remaining medical speciality practice groups affiliated with OHSU and their doctors, including UA's anesthesiologists, consolidated into OHSUMG, and the doctors became employees of OHSUMG. After the consolidation, UA no longer operated as a provider of anesthesiology services but continued in existence only to collect its accounts receivable.[4] After the consolidation, any proceeds UA received as a result of collecting accounts receivable were, after payment of expenses, distributed to the UA anesthesiologists in the form of bonus and severance pay.

Of the many doctors from the different specialty practice groups that consolidated into OHSUMG, the UA anesthesiologists were the only ones who donated to OHSUMG stock or any other interest in their preconsolidation professional service corporation.

By letter dated January 8, 2002, OHSUMG's president notified Kingston that on its books OHSUMG would enter a value of zero for donated UA stock that it received, and he explained:

> Based on advice from our legal and accounting advisors, we are placing the total value of all of the donated shares at $0 on our books. This net valuation is in recognition of the consensus pro-forma cash flow projections developed by * * * [UA] for CY2002 and reviewed by OHSUMG staff. These financials indicate

---

[4] It is not clear from the record whether or when UA was in fact liquidated.

- 15 -

that, as the affairs of UA are wound up over the next year, total projected cash disbursements will approximate total projected cash receipts, thus leaving no unencumbered residual value for the benefit of OHSUMG.

In preparation for a UA January 29, 2002, stockholders meeting, the January 8, 2002, letter from the OHSUMG president was distributed to the UA stockholders, along with a copy of the Houlihan appraisal.  Before the meeting each UA stockholder was given by UA a Form 8283, Noncash Charitable Contributions, that reflected Houlihan's appraised fair market value of the donated UA stock.  In advance of the meeting each UA stockholder was advised by UA's attorney and accountant not to bring to the meeting his or her own tax adviser.

At the January 29, 2002, UA stockholders meeting the UA stockholders discussed how they should report and claim on their 2001 Federal income tax returns charitable contribution deductions with respect to the donation of their UA stock.  At the meeting, in response to concerns from several UA stockholders who suggested that they were considering claiming tax deductions lower than the amounts reported on the Forms 8283 they had been given, UA's attorney and accountant advised the UA stockholders not to attract respondent's attention by deviating from the amounts reported on the Forms 8283 and not to discuss the donations with respondent if contacted.

At the January 29, 2002, stockholders meeting UA's attorney and accountant further advised the UA stockholders not

to show to their own tax advisers the minutes from the UA stockholders meetings or the January 8, 2002, letter from OHSUMG's president.  The trial evidence suggests that petitioners complied with this advice and further that petitioners apparently, with respect to the donations, did not consult with any attorney or accountant who was truly independent and not involved with the planned donation of UA stock.

On their respective 2001 Federal income tax returns, using the Houlihan appraised per-share value therefor of $401.79 for both the voting and the nonvoting shares, 26 of the 28 UA stockholders claimed charitable contribution deductions with respect to the donation of their UA stock.  The remaining two UA stockholders claimed no charitable contribution deduction with respect to the donation of UA stock.

Before taking into account charitable contribution limitations, petitioners generally claimed charitable contribution deductions of $176,788 on their 2001 Federal income tax returns with respect to their UA stock donations. Gunn claimed a charitable contribution deduction of $200,895 on his 2001 joint Federal income tax return relating to his UA stock donation.  Because of the charitable contribution limitation, a number of petitioners carried over the claimed contribution deductions to subsequent years.

On audit of the returns of each of petitioners and the other UA stockholders, respondent, determining that on September 14, 2001, the UA stock had no value, disallowed in their entirety the claimed charitable contribution deductions relating to the donation of UA stock.

Before trial and on the basis of an expert appraisal, respondent agreed that the UA stock had a value of $37 per voting share and $35 per nonvoting share and that charitable contribution deductions were allowable to petitioners to that extent.

## OPINION

Section 170(a)(1) allows a deduction for charitable contributions made during a year. The amount of a charitable contribution of property is equal to the fair market value (FMV) of the contributed property, defined as the price at which, on the date of contribution, "the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.

In general, for Federal tax purposes property is valued as of the valuation date "on the basis of market conditions and facts available on that date without regard to hindsight." Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987)

(emphasis deleted); see <u>Ithaca Trust Co. v. United States</u>, 279 U.S. 151, 155 (1929).

Subsequent events "are not considered to fix fair market value, except to the extent that they were reasonably foreseeable at the date of valuation." <u>Trust Servs. of Am., Inc. v. United States</u>, 885 F.2d 561, 569 (9th Cir. 1989) (citing <u>Estate of Gilford v. Commissioner</u>, <u>supra</u> at 52). Thus, courts may consider relevant subsequent events if they are reasonably foreseeable "because they would be foreseeable by a willing buyer and a willing seller, and they therefore would affect the valuation of the property". <u>Estate of Gimbel v. Commissioner</u>, T.C. Memo. 2006-270.

In deciding valuation issues, trial courts often receive into evidence and consider the opinions of expert witnesses. <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. 282, 295 (1938). Courts may accept the opinion of one expert over the opinion of another expert, <u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 452 (1980), and courts may be selective in determining which portion of an expert's opinion to accept, <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986).

The dramatic difference between petitioners' experts'[5] and respondent's expert's appraised values for the UA stock stems largely from the experts' respective conclusions as to the proper valuation premise--whether to value UA as a going concern.

Petitioners' experts valued UA as of September 14, 2001, as a going concern because they viewed the scheduled January 1, 2002, consolidation of UA into OHSUMG as uncertain.[6]

After careful consideration of the trial testimony and other evidence (including letters, e-mails, minutes of meetings, financial statements, and handwritten notes), we conclude that as of September 14, 2001, UA should not be valued as a going concern. The donation of UA stock was driven by the imminent consolidation of UA (along with the other medical groups) into OHSUMG. On the evidence, it is beyond any reasonable question that petitioners would not have donated their UA stock to OHSUMG had there existed any realistic

---

[5] At trial, in addition to the Houlihan expert petitioners presented expert testimony and an expert report from another expert witness who valued the UA stock at $326 per voting share and $323 per nonvoting share.

[6] In their expert reports neither of petitioners' experts explain how or why they selected a going concern premise of value, and they conveniently and incredibly make no mention of the scheduled Jan. 1, 2002, consolidation.

possibility that the consolidation would not occur by yearend 2001 or soon thereafter.

Petitioners inflate the importance of the problems and delay relating to the OHSUMG pension plan and argue without credible evidence that OHSUMG's ability to provide a governmental plan was a necessary condition for the consolidation. OHSUMG's ability to offer a governmental plan clearly was not a major requirement for the planned consolidation but simply a potential benefit of it. The fact that the consolidation occurred without a governmental plan belies petitioners' argument. Further, with the exception of self-serving testimony by petitioners at trial, there is no evidence in the record that UA management and petitioners were concerned in the least with the possibility that OHSUMG might not offer a governmental retirement plan. The credible evidence indicates that, in this regard, their only real concern was that by the consolidation OHSUMG have some form of pension plan in place.

In addition, the evidence establishes that as of the September 14, 2001, UA stock donation date, it was well known to all concerned individuals that it was highly likely that UA and UA anesthesiologists would take part in the scheduled January 1, 2002, consolidation. The evidence does not indicate that UA management or petitioners at any time expressed to

anyone that petitioners and other UA anesthesiologists had any reservations about the planned consolidation or might decline to participate in the consolidation.  Two key UA stockholders held OHSU or OHSUMG board or committee positions and took part in planning and implementing the consolidation--Gunn and Robinson.  Gunn retired as UA's C.E.O. just months before the scheduled consolidation and was replaced with a C.A.O. who worked almost exclusively on the consolidation.

Petitioners refer to brief statements extracted from two e-mails and from a handwritten note to support their argument that the January 1, 2002 consolidation was uncertain. Petitioners, however, place inordinate weight on this evidence. When viewed and considered in context, the statements do not support petitioners' argument that as of September 14, 2001, there was uncertainty as to whether the consolidation would occur.

While the January 1, 2002, consolidation date may not have been set in stone, by September 2001 there was tremendous commitment by UA, by OHSU, and by OHSUMG management to ensure that by January of 2002 the consolidation would occur.  On the facts before us, a reasonably informed and willing buyer or seller certainly would have known about and would have taken into account the fact that as of September 14, 2001, there was

an extremely high likelihood that by early 2002 UA would no longer be an operating entity.[7]

For the above reasons, in their valuations of UA stock, petitioners' experts erred in treating UA as a going concern. Because petitioners' experts' valuations are based entirely on an incorrect valuation premise, we choose not to rely upon their reports in determining the FMV of the donated UA stock.

Petitioners argue alternatively that even if it were known on September 14, 2001, that on January 1, 2002, UA would no longer be operating, the donated UA stock would at least have a value of approximately $114 per share. We decline to rely on

---

[7] Petitioners argue that regardless of the certainty of the planned consolidation, as of Sept. 14, 2001, a hypothetical willing buyer should be treated as not knowing what everyone else in fact knew of and anticipated (i.e., the planned and imminent consolidation), and a hypothetical willing buyer would make an offer to buy UA stock only on the condition that UA anesthesiologists sign long-term employment contracts and noncompete agreements with UA. While the willing buyer and the willing seller are hypothetical persons who are "presumed to be dedicated to achieving the maximum economic advantage", Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Curry v. United States, 706 F.2d 1424, 1429 (7th Cir. 1983)), petitioners' experts fail to take into account that the economic "advantage must be achieved in the context of market conditions", see id., and that for valuation purposes the "positing of transactions which are unlikely" is frowned upon, Estate of Curry v. United States, supra at 1429. After UA's incorporation, UA employment agreements were month-to-month and did not contain noncompete agreements. Given the clear movement and momentum to consolidate and the UA history of no long-term employment agreements, we find it most improbable and highly unlikely that the UA anesthesiologists would have been willing to enter into any such contracts, and any hypothetical buyer must be deemed to know of that fact during the course of his or her hypothetical negotiations to buy UA.

petitioners' alternative valuation of the UA stock because it did not appear in any of the expert reports and was not adequately explained in petitioners' briefs.

Respondent's expert valued UA as an assemblage of assets because, in his opinion, it was known or knowable on September 14, 2001, that on January 1, 2002, UA very likely would no longer be operating.

Having concluded that UA should be treated as not operating beyond January 1, 2002, respondent's expert dismissed the income approach and the market approach to valuation because those approaches generally presume ongoing business operations, and respondent's expert concluded that the asset-based approach would be the most accurate valuation method. The asset-based approach is a method of business valuation whereby the appraiser estimates the value of the business on the basis of the business's equity.

To estimate total UA equity, respondent's expert first estimated the FMV of UA's assets and liabilities individually. As is typical under the asset-based approach, respondent's expert examined UA's balance sheet to determine the book value of the assets and liabilities. To estimate the FMV of the assets and liabilities, respondent's expert then made

adjustments[8] to several of the book values of the assets and liabilities and concluded that as of July 31, 2001,[9] UA had total assets valued at $3,658,887 and total liabilities valued at $2,200,500, for a total equity value of $1,458,387.

To account for the noncontrolling, nonmarketable nature of UA stock, respondent's expert then applied a 35-percent lack of control discount and a 45-percent lack of marketability discount to the $1,458,387 UA equity value, resulting in a discounted equity FMV of $521,373.

Respondent's expert derived the 35-percent lack of control discount from a study of mergers and acquisitions of publicly traded companies in the health care industry which compared the difference in an entity's share price just before an announced acquisition to the price paid per share by the acquiring business. The study demonstrated that in 1999 and 2000 share prices of stock in health care companies before a merger traded at an average discount of approximately 35 percent relative to

_____

[8] In particular, respondent's expert decreased net accounts receivable to account for expected collection costs, created an accrued sick leave entry to account for an estimated accrued sick leave liability as of the valuation date, and accounted for estimated Federal and State income taxes that would be paid on receivables expected to be collected.

[9] Because UA financial statements were dated July 31, 2001, respondent's expert used a valuation date of July 31, 2001, not Sept. 14, 2001. We perceive no practical difference between the two dates and treat respondent's expert's report as applicable to the date of the donation--Sept. 14, 2001.

their postacquisition share prices--a discount respondent's expert attributes to lack of control.

Respondent's expert derived his 45-percent lack of marketability discount from a study of restricted stock health care companies and from a study of initial public offerings (IPOs).  The restricted stock study compared prices of freely traded stock in public companies with those of restricted but otherwise similar stock.  The study demonstrated that from 1983 to 2000 restricted stock of health care companies traded at a mean and median discount of approximately 39 percent relative to their unrestricted counterparts--a discount respondent's expert attributed to lack of marketability.  The IPO study compared the private-market price of stock sold before a company went public with the public-market price obtained for the stock shortly after the IPO.  The study demonstrated that from 1975 to 1997 pre-IPO stock traded at mean and median discounts of approximately 44 and 46 percent, respectively, relative to the post-IPO stock prices--a discount respondent's expert attributed to lack of marketability.

Respondent's expert then divided the discounted UA equity value of $521,373 by 14,000 (the number of UA stock shares outstanding) to arrive at a per-share value of $37 for voting UA stock.  On the basis of several studies, respondent's expert then applied an additional 5-percent discount to account for

the lack of voting rights of the nonvoting UA stock, resulting in a value of $35 per share for the nonvoting UA stock.

Petitioners have not pointed to, nor do we find, significant flaws in respondent's expert's analysis or in the studies he relied upon that would suggest his report is unreliable, and we adopt respondent's expert's discounts and conclusions of value. On the basis of respondent's expert's appraisal, respondent's concession as to the value of the UA stock, and respondent's concession as to petitioners' entitlement to charitable contribution deductions relating thereto, we conclude that on September 14, 2001, the UA voting and nonvoting stock had a per-share value of $37 and $35, respectively. Petitioners are entitled to charitable contribution deductions only in the amounts now allowed by respondent.[10]

Under section 6662(h) a taxpayer may be liable for a 40-percent accuracy-related penalty on the portion of an underpayment of tax attributable to a gross valuation misstatement. Section 6662(h)(2)(A) provides that there is a gross valuation misstatement if the value of property as claimed on a tax return is 400 percent or more of the amount

---

[10] For a recent Tax Court opinion involving a donation and the valuation of a medical professional service corporation's goodwill to a tax-exempt entity and the Court's disallowance of claimed charitable contribution deductions relating thereto, see Derby v. Commissioner, T.C. Memo. 2008-45.

determined to be the correct value. However, no valuation misstatement penalty is imposed unless the portion of the underpayment attributable to the valuation misstatement exceeds $5,000. See sec. 6662(e)(2).

The increased penalty under section 6662(h) will not apply to any portion of an underpayment if the taxpayer establishes that there was reasonable cause for such portion and that the taxpayer acted in good faith. See sec. 6664(c)(1). However, the exception under section 6664(c)(1) can apply to a section 170 deduction only if (1) the claimed value of the property was based on a "qualified appraisal" made by a "qualified appraiser", and (2) the taxpayer made a good-faith investigation of the value of the contributed property. See sec. 6664(c)(2).

Respondent argues that petitioners did not act in good faith and did not make a good-faith investigation of the value of the donated UA stock.

We agree with respondent. From the beginning, the plan to donate UA stock on the brink of the January 1, 2002, consolidation was presented to UA stockholders as a way to reap a potential "150K" windfall. Petitioners are well educated and surely were cognizant of the imprudence of valuing the UA stock at such a high value given the likelihood that by 2002 UA would no longer be an operating entity.

Petitioners were aware of the January 8, 2002, letter from OHSUMG's president stating that OHSUMG had decided to book the donated stock at zero; and while the value of property in the hands of the donee is generally not determinative of FMV, see Estate of Robinson v. Commissioner, 69 T.C. 222, 225 (1977), petitioners should have at least questioned the difference in reporting by OHSUMG and by themselves.  Furthermore, the fact that petitioners were advised not to bring their own tax advisers to the January 29, 2002, UA stockholders meeting and were directed to withhold information from their own tax advisers should have put petitioners on notice as to the inaccuracy of the claimed donations.

Petitioners argue that they relied in good faith on the Houlihan appraisal and on advice from UA's attorney and accountant.  However, to establish good faith, petitioners cannot blindly rely on advice from advisers, nor on an appraisal. Kellahan v. Commissioner, T.C. Memo. 1999-210; Estate of Goldman v. Commissioner, T.C. Memo. 1996-29.  We note that under section 1.6664-4(c)(1)(ii), Income Tax Regs., a taxpayer will not be considered to have reasonably relied in good faith on advice from an adviser if the advice is based on an "unreasonable" assumption the "taxpayer knows, or has reason to know, is unlikely to be true".  This would appear to be

particularly applicable where no adviser is sought out who is truly independent of the planned transaction.

We conclude that petitioners did not make a good faith investigation as to the value of their donated UA stock and did not act in good faith, and we conclude that the reasonable cause exception in section 6664(c)(1) does not apply.

The value of the donated UA stock that was claimed on petitioners' Federal income tax returns ($401.79 per share for voting and nonvoting stock) exceeds 400 percent of the value determined to be correct ($37 and $35 per-share for voting and nonvoting stock, respectively). However, whether the portion of the underpayment attributable to the valuation misstatement exceeds $5,000, and thus whether the 40-percent penalty under section 6662(h) applies, will depend on the magnitude of the underpayment of tax as calculated for each petitioner under Rule 155.

We hold that each petitioner is liable for the 40-percent accuracy-related penalty of section 6662(h) if, for the years in issue, the Rule 155 calculation determines that each petitioner's underpayment exceeds $5,000.

Under section 6662(a) and (b)(1), a taxpayer may be liable for a 20-percent accuracy-related penalty on the portion of an understatement of tax attributable to negligence or to disregard of rules or regulations. Negligence is strongly

indicated where a taxpayer "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances".  Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

In view of the evidence before us, we conclude that petitioners were negligent and that petitioners' underpayments were attributable to their negligence.  We hold that to the extent petitioners are not liable for the 40-percent penalty under section 6662(h) (because their underpayments do not exceed $5,000 under the Rule 155 calculation), petitioners are liable for the 20-percent penalty under section 6662(b)(1).

These cases are decided on the preponderance of the evidence and are unaffected by section 7491.  See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

To reflect the foregoing,

Decisions will be entered

under Rule 155.